# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL NO. 1:18-MJ-00141 (GMH)** |
| | **:** | |
| **JEFFREY RAPHIEL CLARK, JR.** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |
| | **:** | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRE-TRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its motion for pretrial detention of defendant Jeffrey Raphiel Clark, Jr.  In support of this motion, the United States relies on the following points and authorities and such other points and authorities as may be cited at any hearing on this matter.

### I.        Legal Principles Governing Requests for Detention.

The Bail Reform Act lists four factors that guide a court's pre-trial detention decision: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug, (2) the weight of the evidence against the person, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  See 18 U.S.C. § 3142(g). A judicial determination that a defendant should be detained pending trial on the ground of community safety must be supported by clear and convincing evidence.  *United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996).  When "risk of flight" is the basis for detention, the government must satisfy a preponderance of the evidence standard.  *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

Under 18 U.S.C. § 3142(f)(1)(E), a person may be preventatively detained pending trial when he is charged with a crime involving the possession or use of a firearm.  Pursuant to 18 U.S.C. §§  922(g)(3), 924(a)(2) a felony violation with a statutory penalty of up to 10 years imprisonment occurs when an individual who is an unlawful user of, or is addicted to, any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802)) possesses a firearm in or affecting commerce or receives a firearm which has been shipped or transported in interstate or foreign commerce.

Under 18 U.S.C. § 3142(f)(1), a person may be preventatively detained pending trial when he is charged with a "crime of violence."  *See* 18 U.S.C. § 3142(f)(1)(A).  At least one federal court has expressly held that a violation of 18 U.S.C. § 922(g)(3) constitutes a crime of violence. *United States v. Ditrapano*, 2006 WL 1805848 (WDWV 2002) ("Offense of being a person unlawfully using or addicted to a controlled substance and in possession of a firearm or ammunition, with which defendant was charged, constituted a crime of violence within meaning of Bail Reform Act, so as to entitle government to pre-trial detention hearing").

Finally, under 18 U.S.C. § 3142(f)(2)(A), a person may be preventatively detained when he presents a risk of flight.

## II.    Factual proffer of the evidence supporting the charge against the defendant.

On October 27, 2018, at approximately 9:54 a.m., Robert Bowers, a white supremacist who has made anti-Semitic statements on internet posts, attacked the Tree of Life Synagogue in Pittsburgh, Pennsylvania, killing 11 people who were attending religious ceremonies in the synagogue. Bowers used an assault rifle in the attack on the Tree of Life Synagogue.  The Federal Bureau of Investigation (FBI) is investigating Bowers' attack as a hate crime.

The ongoing investigation regarding Bowers has revealed that shortly before he entered the synagogue and began shooting, Bowers posted a message on a social networking site named "Gab" using the username "@onedingo."   In that message, Bowers made the following comment about HIAS, a Jewish-American nonprofit organization: "HIAS likes to bring invaders in that kill our people. I can't sit by and watch my people get slaughtered. Screw your optics. I'm going in."[1]

The FBI's investigation of Bowers revealed that Bowers' followers on Gab included a District of Columbia resident, Jeffrey Raphiel Clark, Jr., who resides in Northwest, Washington, D.C. (the PREMISES).  Jeffrey Clark previously resided at the PREMISES with his father, sister, and younger brother, Edward William "Teddy" Clark.

On October 27, 2018, within hours after Bowers' fatal attack on the Tree of Life Synagogue, news media outlets and online sources reported that Gab was cooperating with federal law enforcement authorities in their investigation of Bowers.[2]  Sometime before 12:45 P.M. on October 27, 2018, Edward "Teddy" Clark went to Theodore Roosevelt Island in Washington D.C. and committed suicide.   Edward Clark killed himself with a Berretta pistol. Officers who responded to the scene discovered that, in addition to the eight remaining rounds contained in the magazine of Clark's Berretta pistol, Edward Clark also possessed two additional magazines of ammunition containing 20 additional rounds of ammunition. Officers did not locate a suicide note, but did locate and seize a cell phone from Edward Clark. Edward Clark was 23 years old.

On November 2, 2018, the FBI's Washington Field Office (WFO) Command and Tactical Operations Center (CTOC) received a call from W-1 and W-2 pertaining to their family members

---

[1] According to the HIAS website, "HIAS works around the world to protect refugees who have been forced to flee their homelands because of who they are, including ethnic, religious, and sexual minorities. For more than 130 years, HIAS has been helping refugees rebuild their lives in safety and dignity."

[2]  On the day of the shooting, Gab.com released a public statement that it had suspended Bowers' account: "We then contacted the FBI and made them aware of this account and the user data in our possession."  *See* "What's Gab, the social platform used by the Pittsburgh shooting suspect?" (CNN, October 27, 2018).

Jeffrey and Edward Clark.  W-1 and W-2 reported that Jeffrey and Edward Clark had been heavily involved in the white nationalist movement, and that they were connected with the Pittsburgh synagogue shooter through Gab.  After the death of Edward Clark, Jeffrey Clark became more outspoken about his radical views, expressing them openly to his family members who were in the area following Edward Clark's death.  During these conversations, Jeffrey Clark defended Robert Bowers' killings at the Tree of Life Synagogue.  Jeffrey Clark also stated that he and Edward Clark had both fantasized about killing "Jews and blacks."  W-1 and W-2 stated that Jeffrey Clark had been "really riled up" and "agitated," and they called the FBI out of concern that he could be a danger to himself or others.  W-1 and W-2 were so concerned that they went to Jeffrey Clark's residence (the PREMISES) to check on him and to confiscate his firearms.  Jeffrey Clark gave them four boxes, which they took to their home for safekeeping.  As described below, those boxes did not contain any firearms, but did contain parts for weapons that are not registered to either Jeffrey or Edward Clark.

Also on November 2, 2018, WFO Joint Terrorism Task Force (JTTF), Special Agent (SA) and Task Force Officers (TFO) interviewed W-1 and W-2, and other family members who were in the area following Edward Clark's death.  W-1 and W-2 stated that Jeffrey and Edward Clark were heavily involved in the white nationalist movement.  According to W-1 and W-2, both Jeffrey and Edward Clark attended the 2017 "Unite the Right" rally in Charlottesville, Virginia. W-1 and W-2 believe that there are photos online of them standing next to James Alex Fields, the white nationalist who drove a car into a crowd of protestors in Charlottesville, Virginia, killing one person and injuring nineteen. According to W-1 and W-2, Jeffrey and Edward Clark openly discussed killing Jews and black people, and openly admired Timothy McVeigh, Ted Kaczynski,

and Charles Manson.  According to W-1 and W-2, Jeffrey and Edward Clark believed that there

would be a race revolution, and they wanted to expedite it.

According to W-1 and W-2, in regard to the shooting at the Tree of Life Synagogue, Jeffrey Clark

stated that the victims deserved it.  W-1 and W-2 also stated that Jeffrey Clark believed that a homosexual

Jewish couple was having an adopted baby circumcised that week, and that justified Bowers' actions.

W-1 and W-2 showed the interviewing agents a photo of Jeffrey and Edward Clark holding

a flag. The FBI recognized this flag as the flag of Vanguard America ("VA") (Attachment C).  The

Southern Poverty Law Center describes VA as:

> A white supremacist group that opposes multiculturalism and
> believes that America should be an exclusively white nation.  Their
> right-wing nationalist slogan, 'Blood and Soil,' romanticizes the
> notion that people with 'white blood' have a special bond with
> 'American soil.' This philosophy originated in Germany (as Blut
> und Boden) and was popularized by Hitler's regime. VA uses 'For
> Race and Nation' as an alternative slogan. Along those lines, the VA
> manifesto (as of April 2018) maintains that 'The racial stock of this
> nation was created for white Christian Anglo/Europeans by white
> Christian Anglo/Europeans. All other ethnicities, races, religions
> and demographics are absolutely not compatible with this nation's
> original culture… VA has also warned against the influence of 'the
> international Jew,' tweeting in July 2017, 'Those behind the
> subversive elements eroding our culture often have something in
> common. Jewish influence is prevalent, invasive, and dangerous.'
> This theme is echoed in their 2018 manifesto, which states that
> 'Islam, Judaism and all other non-European or foreign religions'
> should not have the freedom to practice in the United States.

W-1 and W-2 stated that their family has a history of depression, but they were not aware of any

indications that Edward Clark would commit suicide.  Further, W-1 and W-2 did not know why Edward

Clark had so many bullets with him, but they believed he may have been planning to commit an act of

violence on the day that he died.

On or about November 8, 2018, W-2 also informed agents that Jeffrey Clark had engaged

in unusual behavior on October 27, 2018.  According to W-2, Jeffrey Clark woke up around noon

on October 27, 2018, (after the Tree of Life Synagogue shooting) and discovered that Edward was

not home.  Despite the fact that Edward Clark was 23 years old, Jeffrey Clark called his mother to report that Edward was missing, and reported to his mother than he was going to call the police to report Edward missing.

### Specific Information related to Drug Use

W-1 and W-2 also told agents that Jeffrey Clark needs medical treatment and needs to detox from drug use.  According to W-1 and W-2, Jeffrey Clark and Edward Clark would stay at home a lot, smoke marijuana, and play video games such as "Ethnic Cleansing."  They were not aware of any other kinds of drug use, but believed it was possible based on of their behavior. W-1 and W-2 also stated that Jeffrey Clark was involved in selling marijuana.[3]

On November 8, 2018, agents conducted a further interview with W-2.  During that interview, W-2 stated that she had smelled marijuana in the PREMISES as recently as October 27, 2018, and November 4, 2018.  W-2 also reported that during this period she observed two propane torches in the kitchen area of the PREMISES.  When W-2 asked Jeffrey Clark whether the torches were for welding, he just smiled.  The FBI is aware that propane torches such as those described by W-2 are consistent with those used for smoking methamphetamine.  The FBI learned that Jeffrey Clark's Gab profile page includes the following description of himself: "Meth-smoking, pipebomb making, mailman-murdering,#Fed • #DemoKKKrat, 'Che Guevara of the altright'. . . . "

A criminal records check disclosed that in May of 2008 Jeffrey Clark was charged by the U.S. Park Police with possession of marijuana and distribution of marijuana, however, both of those cases were not charged.

---

[3] W-2 later stated that Jeffery Clark had tried to stop smoking marijuana when he became active in the white supremacist movement, but he was not successful in doing so.  Another family member also stated that Jeffery and Edward Clark talked openly about their drug use, and that the PREMISES often smelled of marijuana.

## Specific Information Regarding Firearms

A review of records maintained by the District of Columbia revealed that four firearms were registered to the Clark brothers.  Jeffrey Clark is the registered owner of a Remington Arms 1911 R1 handgun, and a Mossberg Maverick 88 shotgun.  Edward Clark was the registered owner of a Beretta 92FS handgun and a Ruger Mini 14 Ranch Rifle.  Edward Clark's Beretta handgun was recovered at the scene of his apparent suicide on October 27, 2018.

Following Edward Clark's suicide, a D.C. homicide detective went to the PREMISES.  During a conversation with Jeffrey Clark, Clark stated that Edward's rifle was still located in the PREMISES.  The homicide detective did not ask Jeffrey Clark about his firearms. There  are  no firearms manufacturers located within the District of Columbia.  Accordingly, the weapons registered to the Clark brothers necessarily traveled in interstate commerce.

W-1 and W-2 showed agents the four boxes of gun parts that they obtained from Jeffrey Clark.  Upon inspection of the boxes, agents observed that they were filled with gun parts, but no functional firearms.  Agents recognized several items in the boxes as parts used to modify AR-15 assault rifles.  The FBI has opined that these parts could not be used to modify any of the firearms that are registered to the Clark brothers in the District of Columbia.

On November 9, 2018, W-1 informed agents that the three remaining registered fireams had been removed from the PREMISES to a home owned by W-1 outside of the District of Columbia.   On November 9, 2018, agents recovered those three firearms, specifically, a Remington Arms 1911 R1 handgun, a Mossberg Maverick 88 shotgun, and a Ruger Mini 14 Ranch Rifle.  In addition, officers recovered a Colt .38 Special handgun that Jeffery Clark surrendered to W-1.  This gun was not registered to either Jeffrey or Edward Clark.

Agents also recovered two boxes of AR-15 rifle conversion kits.  The conversion kits contained the upper portions of a .22 caliber AR-15 and other components used to convert an AR-

15 to a complete rifle.  However, the two lower portions of the AR-15s were missing.  These lower portions can be easily converted to function as AR-15 rifles by adding a different upper section to fire .22 caliber up to 5.56 x 45 mm NATO rounds.

In addition, agents recovered four high-capacity AR-15 magazines capable of holding up to 30 rounds of ammunition.

### Specific Information Related to Gab

The FBI has learned that Jeffrey Clark would communicate with users on "Gab."  Gab owns and operates a free-access social-networking website of the same name that can be accessed at http://www.Gab.com.  Gab allows its users to create their own profile pages, which can include a short biography and a photo of themselves. Gab also permits users to create and read 300-character messages called "Gab," and to restrict their "Gabs" to individuals whom they approve.  Upon creating a Gab account, a Gab user must create a unique Gab username and an account password, and the user may also select a different "display name" of 20 characters or fewer to identify his or her Gab account.  The Gab user may also change this username, password, and display name without having to open a new Gab account.

A Gab user can post a personal photograph or image (also known as an "avatar") to his or her profile, and can also change the profile background or theme for his or her account page. In addition, Gab users can post "bios" of 160 characters or fewer to their profile pages.  In addition, when a Gab includes a Gab username, often preceded by the @ sign, Gab designates that Gab a "mention" of the identified user.

On October 27, 2018, after learning of his brother's suicide, Jeffrey Clark told W-1 and W-2 that he thought the synagogue shooter (Bowers) had "friended" him on Gab.

On or about November 4, 2018, Jeffrey Clark told W-2 that he expected the FBI to "show up" because of his contacts with Bowers on Gab.  During this conversation, Jeffrey Clark told W-2 "they had not broken any laws, but at some point if a line gets crossed, I would be violent,

everyone has a line, including you."  The term "they" was an apparent reference to Clark and his associates in Vanguard America.

The FBI's investigation into Bowers confirmed that Bowers and Jeffrey Clark were "following" each other on Gab.

The FBI has identified Jeffrey Clark's Gab username as "DC BOWL GANG @PureWhiteEvil" ("DC BOWL GANG").[4]  The FBI also has reason to believe that the Gab username for Edward Clark was "DC_Stormer."  The FBI viewed Jeffrey Clark's Gab profile page following Edward Clark's death.  Jeffrey Clark's profile picture includes a photograph of two individuals wearing ski masks that are believed to be Jeffrey and Edward Clark, holding what appear to be the Mossberg Maverick 88 shotgun and the Ruger Mini 14 Ranch Rifle that were registered to the Clark brothers in the District of Columbia.  The Clark brothers are posing in front of a flag with a skull and crossbones.  W-1 and W-2 recognized the brick background in the photograph as the basement of the PREMISES. This flag, or one similar to it, was recovered during the execution of the search warrant in this case. The skull on the flag has what appears to be a bowl-style haircut.  Superimposed over this photograph is an image of Dylann Roof (Attachment D).

On his profile page, Jeffrey Clark describes himself as: "Aka DC Stormer (RIP) • Meth-smoking, pipebomb-making, mailman-murdering,#Fed • #DemoKKKrat, 'Che Guevara of the altright,' - Glenn Beck, Not a NEET – just bathing in White priviledge, Bowlcut Nationalism is the only way forward. . . ."  (Attachment D).

---

[4] The FBI believes that the term "bowl gang" is a reference to the bowl-style haircut of Dylann Roof, the white supremacist convicted of perpetrating the June 17, 2015, massacre at Emanuel African Methodist Episcopal Church in Charleston, South Carolina, that left nine people dead.

On or about October 26, 2018, Jeffrey Clark posted a caricature of a male armed with a rifle, spattered in what appears to be blood, followed by the following post: "Nah he was BASED! Get used to it libtards. This was just a dry run for things to come." (Attachment E).[5]  In the screenshot of this image that was obtained by the FBI, the image preceding this post appears to be an image of the van that was seized from Cesar Sayoc following his arrest on October 26, 2018, for charges related to his alleged mailing of pipe bombs to various public figures (Attachment E).

In one of Jeffrey Clark's Gab posts following the attack on the Tree of Life Synagogue, he stated, "The fucking kikes that got shot by the hero #RobertBowers were all active supporters of pedophilia (not all kikes amirite? lol) and every last one of them deserved exactly what happened to them and so much worse"  (Attachment F).

In another post following the attack on the Tree of Life Synagogue, Jeffery Clark reposted an image that included the text "SCREW YOUR OPTICS IM GOING IN ROBERT BOWERS" and the caption "all hail Robert 'Real White Power Hours' Bowers! #HeroRobertBowers #SaintRoofWouldBeProud #HeroWeNeedButDontDeserve" (Attachment G).

### Post-Arrest Investigation

On November, 9, 2018, based on the foregoing information, this Court issued an arrest warrant and criminal complaint charging Jeffrey Clark with one count of Unlawful Possession of Firearms by a Person who is a Unlawful User of or Addicted to any Controlled Substance in violation of 18 U.S.C. § 922(g)(3), and Unlawful Possession of a High Capacity Magazine in violation of  7 D.C. Code § 2506.1 (b).

Agents of the FBI arrested the defendant on November 9, 2018.  After the FBI advised Clark of his Miranda rights, Clark waived his rights and provided a voluntary statement to the FBI. Clark admitted that he was a member of white nationalist groups and followed their ideology.

---

[5] In previous filings, the government stated that this was an image of Robert Bowers that Jeffrey Clark posted following the Tree of Life Synagogue attack.  Further investigation indicates that this information was incorrect.

Clark stated that he and his younger brother Edward started to get into firearms following the 2016 election because they believed there was going to be a civil war. Clark talked freely about firearms; however, he became evasive when asked about his ownership of AR-15 and AK-47 weapons.

When asked about Gab and Bowers the following exchange took place between the questioning agent and Clark:

Q:  So, when we started talking about Gab you kinda got a little nervous, What's up with that?

A:  You can understand why based on what happened with Robert Bowers why I would be a little skeptical about talking about [Gab].

Q:  What happened with Robert Bowers?

A:  He shot up that church or that synagogue didn't he?

Q:  He did, he did. . . Why do you think he did it?

A:  He did it because he's a white nationalist and he's mad at Jews. . . . I know why he did it, or I know why he claimed he did it, I saw the post and everything. He was upset with what . . . what he sees as Jewish groups destroying America based on what he saw from that caravan, the migrant caravan that was going on, and he decided he wanted to retaliate.

Q:  Did you have any communications with him on Gab?

A:  May or may not have. I don't know honestly, . . . I recognized the name and when I first heard about it. I saw the post and recognized the picture. He may have followed me, I don't even know. I will say unequivocally that I never had any interactions with him that I remember personally and I certainly never spoke . . . I said some very, very extreme stuff, I said some stuff that even like you know, maybe like expressed like support of violence if certain lines were crossed, but I never told anyone to go do anything or ever issued any credible threat or anything like that. . . .

Clark was reluctant to talk about his brother Edward. Clark did opine that his brother's suicide had nothing to do with Bowers, and that his brother had been "black-pilled" by society. The FBI knows that "black-pilled" is a phrase used to describe a state of hopelessness.

On November 9, 2018, this Court also authorized a search of the PREMISES. During the execution of the search warrant, officers noted that the entire house smelled like marijuana. In

Jeffrey Clark's bedroom and a room adjacent to his bedroom, agents seized a marijuana grow operation including approximately ten plants that were 6-8 inches tall; marijuana smoking devices including pipes, bongs, and what appeared to be THC vapor pods, and a marijuana grinder. On a patio to the PREMISES officers located a marijuana plant that was approximately 30-36 inches tall.

In Jeffrey Clark's bedroom agents located a black powder pistol, with the initials "JR" on the foam container, shotgun shells, and boxes of ammunition. In a sectioned-off area of the basement, agents located an identical black powder pistol. In Edward Clark's room, agents located two ballistic vests and two ballistics helmets as well as bullet-resistant plates for ballistic vests and two gas masks. The ballistic vests appeared to be the same as those worn in Jeffrey Clark's posts on Gab.

On November 10, 2018, the defendant tested positive for marijuana when he was tested following his arrest in this case. It does not appear that he was tested for the use of methamphetamine (Attachment H).

During the execution of the search warrant at the PREMISES, agents located evidence that highlights the defendant's association with groups associated with violence and the threat he poses to the public. These items include:

- A flyer from the Attomwaffen Division stating "THIS DEPRAVITY ONLY BREEDS THEIR WEAKNESS A WEAK OPPOSITION PUTS THEM AT OUR MERCY . . . WE SHOW NONE" (Attachment I);[6]

---

[6] According to the Anti-Defamation League:

Atomwaffen Division (AWD) is a small neo-Nazi group that became active in 2016. According to the AWD website, they are "a revolutionary national socialist organization centered around political activism and the practice of an autonomous fascist lifestyle." They promote the idea that societal and governmental "systems" are collapsing and that democracy and capitalism have "given way to Jewish oligarchies and globalist bankers resulting in the cultural and racial displacement of the white race." Members train in preparation for an impending race war and promote the use of violence to reach their goal of "uncompromising victory." In a promotional video published on January 21, 2018, members, dressed in military-styled camouflaged fatigues, shout "gas the Kikes" and "race war now" as they fire weapons and practice tactical maneuvers. . . .

- Boxes of ammunition, including hollow-point ammunition (Attachment I);
- A drawing of an individual pointing a rifle at a male figure wearing a yarmulke (Attachment I);
- A rope noose hanging above his bed (Attachment I);
- Body armor and helmets (Attachment I);
- A Nazi flag containing the handwritten inscription "Hail Victory" (Attachment I).

## III.   The defendant should be detained.

Under the factors set forth in 18 U.S.C. § 3142(g), the government will demonstrate the defendant presents both a danger and a risk of flight.

### A.   The Nature and Circumstances of the Offense

In short, the crime the defendant has been charged with is serious within the meaning of § 3142(g)(1).  By its express terms, § 3142(g)(1) focuses on "the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a Federal crime of terrorism, or involves a minor victim or controlled substance, firearm, explosive, or destructive device."  18 U.S.C. § 3142(g)(1) (emphasis added).  Here, the violation of 18 U.S.C. § 922(g)(3) involves both concurrent illegal use of a controlled substance and possession of firearms.

A consideration of the nature and circumstances of the offense also requires the Court to weigh the possible penalty the defendant faces upon conviction.  *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990).  Here, the seriousness of the defendant's crimes is reflected in the possible sentence he would face if convicted.  If defendant is convicted of an offense under 18

---

Atomwaffen members have a macabre fascination with serial killer Charles Manson and his vision of a race war between whites and blacks. For this reason, in 2017, [John] Denton and other Atomwaffen members sought out neo-Nazi Manson devotee and former American Nazi Party member, James Mason, and republished some of his writing, including Siege, a book based on a collection of newsletters Mason wrote in the 1980s. In addition to Charles Manson, AWD members pay tribute to other white men who've committed mass murders, including Dylann Roof,  Anders Breivik, Ted Kaczynski and Timothy McVeigh, even referring to the latter three as "the father, the son, and the holy spirit."

Available at https://www.adl.org/resources/backgrounders/atomwaffen-division-awd

U.S.C. § 922(g), the maximum sentence of imprisonment is 10 years.  In addition, the defendant

also faces an additional period of imprisonment of up to 12 months for violating D.C. Code §7-

2506.01(b) (Possession of a Large Capacity Ammunition Feeding Device).

**B.     The Nature and Seriousness of the Danger to Any Person or the Community that Would be Posed by the Defendant's Release**

As noted above, not only did the defendant possess multiple firearms, but he is an active

user of marijuana as indicated by reports from family members, his indoor grow operation, his

positive drug test following his arrest, and his post-arrest statements.  Protecting the public from

the dangerous combination of drug use and firearms possession lies at the heart of 18 U.S.C. §

922(g)(3).  *See  United States v. Carter*, 669 F.3d 411, 420 (4th Cir. 2012) (marijuana users "would

not be immune from the deleterious effects of using illicit drugs that the government might be able

to substantiate, such as the loss of self-control, which threaten the safety of others.").  *See also*

*United States v. Winchester*, 916 F.2d 601, 606 (11th Cir.) ("The title of the statute, the Gun

Control Act of 1968, leaves no doubt that the statutory purpose is to limit or control the possession

of firearms.  The statutory structure indicates that, in enacting section 922(g), Congress sought

only to bar the possession of firearms by certain types of persons that it considered dangerous.");

*United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011) ("this court observed that Congress

sought to 'keep firearms out of the possession of drug abusers, a dangerous class of individuals,'

and concluded that § 922(g)(3) was 'the type of "longstanding prohibition[ ] on the possession of

firearms" that *Heller* declared presumptively lawful.'").

The defendant in this case poses a further threat to the public because, interlaced with the

defendant's drug use and possession of firearms, is his glorification and justification of acts of

violence directed at racial, religious and LGBTQ communities.  The defendant was unabashed in

describing himself as a white nationalist, who was "committed to the survival of the white race by

any means necessary."  The glorification of acts of violence against minority groups strikes fear and apprehension in members of such groups.  Thus, the release of the defendant in this case would place the members of such communities in fear of imminent danger.

Further, the defendant in this case faces a punishment of not only imprisonment, but also the prospect of being prospectively barred from possessing firearms in the event he is convicted of a felony.  During his post-arrest statement, the defendant, while describing some of his online posts, stated:  "I said some very, very extreme stuff, I said some stuff that even like you know, maybe like expressed like support of violence if certain lines were crossed, but  I never told anyone to go do anything or ever issued any credible threat or anything like that. . . ."  During the ensuing conversation about what the defendant meant by lines, the defendant stated "We should take up arms against the government if they take away our guns."

Of further concern is the defendant's post on or about October 26, 2018, that "This was just a dry run for things to come."  This post was clearly designed to convey a message that the defendant and others who hold his views plan to commit future acts of violence. The Court should not view this statement as simple hyperbole in light of the defendant's access to weapons, possession of body armor, possession of high-capacity ammunition magazines, glorification of acts of violence, and proclamations that he was "committed to the survival of the white race by any means necessary."

Finally, as discussed in the statement of probable cause, the defendant's own relatives, who have had the opportunity to observe him and speak with him, contacted the FBI because they were concerned that Jeffrey Clark posed a threat to himself and/or others.

C.      **The Weight of Evidence Against the Defendant**

Without belaboring the discussion of the evidence above against the defendant, it is sufficient to say that the case against him is overwhelming.  The evidence against the defendant includes his own admissions, reports from family members, the defendant's drug test results, the recovery of controlled substances from the defendant's residence, the recovery of three firearms that were registered to the defendant or his brother, as well as an unregistered firearm that the defendant provided to a family member,  two additional firearms that were recovered during the execution of the search warrant, and posted images of the defendant with firearms.

D.      **The History and Characteristics of the Defendant**

The defendant's characteristics demonstrate his danger and risk of flight.  The history and characteristics of a person include, "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings."  18 U.S.C. § 3142(g)(3)(A).  Although the defendant is 30 years old and graduated from high school, he is not employed, and, as previously described, the defendant is a frequent user of marijuana.  It is also noteworthy that as of this filing the government has not recovered the lower portions of the AR-15 rifles referenced above.  While the defendant has resided in the family home for the last 13 years, it is clear that the structure of the home has not deterred the defendant from engaging in the conduct that led to the criminal charges in this case.  Although the defendant has resided in the District of Columbia, that connection is not sufficient incentive to keep him here now that he is facing more than ten years in prison.  When asked about his future plans, such as education or employment, the defendant indicated he would like to move to West Virginia to non-violently "take-over" a town with like-minded white

nationalists.   This highlights the fact that as the defendant appears before the court, his characteristics include a toxic combination of drug use, firearms access, hatred, and glorification of acts of violence.   As such, at this time, the defendant poses a risk of flight and an imminent threat to the community, particularly vulnerable minority communities.

**IV.     Conclusion.**

For the foregoing reasons, as well as those that will be set forth at a hearing on this motion, the government respectfully submits that there exists no condition or combination of conditions which would assure the return of this defendant to all future court appearances and the safety of any person or the community.   Accordingly, the government requests that the Court order the pre-trial detention of the defendant.

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845

By:      _____/s/_____
JOHN CUMMINGS
Assistant United States Attorney
Bar No. 986573
555 Fourth Street, N.W., Room 11-824D
Washington, DC  20530
John.cummings@usdoj.gov
(202) 252-7271