UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | ) | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | Criminal No. 18-cr-338 (TJK/GMH) |
| | ) | |
| **JEFFREY RAPHIEL CLARK, JR.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DETENTION MEMORANDUM**

This matter comes before the Court upon application by the United States that Defendant, Jeffrey Raphiel Clark, Jr., be detained pending trial pursuant to 18 U.S.C. § 3142. Defendant is charged by indictment with one count of unlawful possession of a firearm and ammunition by a person who is an unlawful user of a controlled substance in violation of 18 U.S.C. § 922(g)(3) and one count of possession of a large capacity ammunition feeding device in violation D.C. Code § 7-2506.01(b). The Court held a detention hearing on November 16, 2018. At the conclusion of that hearing and upon consideration of the proffers and arguments of counsel and the entire record herein, the Court ordered Defendant held without bond. This memorandum is submitted in compliance with the statutory obligation that "the judicial officer shall . . . include written findings of fact and a written statement of the reasons for the detention." 18 U.S.C. § 3142(i)(1).

**I.   FINDINGS OF FACT**

At the detention hearing, the United States proceeded by proffer based on the indictment. The defense offered no contrary evidence on the merits of the offense. Accordingly, the Court makes the following findings of fact:

A.   **The Charged Offense**

Shortly before Robert Bowers entered the Tree of Life Synagogue in Pittsburgh on the morning of October 27, 2018, and murdered eleven people, he had posted an anti-Semitic message on a social networking website called Gab.  At some point before 12:45 p.m. that same day, Defendant's brother, Edward Clark, who lived with Defendant and their father in a residence in the northwest quadrant of the District of Columbia, went to Theodore Roosevelt Island and shot himself with a Beretta pistol.  Law enforcement who responded to the scene found the pistol with eight more rounds in the chamber, as well as two additional magazines of ammunition containing twenty rounds.

On November 2, 2018, the FBI's Washington Field Office received a call from two individuals who identified themselves as family members of Defendant and Edward Clark ("Witness 1" and "Witness 2").  In a series of interviews, they reported that the brothers had been involved in the white nationalist movement.  They had, for example, attended the 2017 "Unite the Right" rally in Charlottesville, Virginia, which culminated in a white nationalist driving a car into a crowd of counter-protesters, killing one and injuring nineteen.  Both had openly discussed killing Jewish people and black people, and both admired domestic terrorists like Timothy McVeigh and Ted Kaczynski.  Witness 1 and Witness 2 also showed FBI agents a photo of the brothers holding a flag of Vanguard America, a white supremacist/white nationalist group, and stated that the brothers had asserted that they wanted to expedite a coming "race revolution."

The family members also reported that Defendant and his late brother were connected to the Pittsburgh synagogue shooter through Gab, noting that on the day of the synagogue killings, Defendant had told them that Bowers had "friended" him on the website.  According to them, after

he learned of his brother's suicide, Defendant became more vocal about his views, even defending Bowers' crimes and asserting that the victims deserved to be killed, in part because he had heard that a gay Jewish couple was adopting a baby and having him circumcised that week in the Tree of Life Synagogue. Defendant also informed Witness 2 that he expected the FBI to question him because of his connections with Bowers on Gab. Defendant reportedly told Witness 2 that he and his brother had not broken any laws, but stated that, "if at some point a line gets crossed, I would be violent."

Finding that Defendant had become worrisomely agitated in the wake of the mass murder at the Tree of Life, the family members attempted to confiscate Defendant's firearms. Defendant gave them four boxes containing parts of weapons, but no actual firearms, although records show that Defendant was the registered owner of two guns, and his late brother was the registered owner of two more, including the Beretta that he had used to shoot himself (and which was recovered at the scene of that incident).

On November 9, 2018, after Witness 1 reported to the FBI that the three remaining firearms registered to the brothers had been removed from house, agents recovered them from Witness 1's house. Agents also recovered an unregistered Colt .38 Special handgun that Defendant had surrendered, as well as the boxes of weapon parts noted above. Among the other items recovered were two AR-15 rifle conversion kits, each containing the upper portion of a .22 caliber AR-15 and other components used to convert an AR-15 into a complete rifle. However, law enforcement has not recovered the lower portions of the two AR-15s, which can be converted to function as AR-15 rifles by adding a different upper section to them. None of the parts were from guns registered to either Defendant or his brother.

Witness 1 and Witness 2 were also concerned about Defendant's marijuana use, noting that the brothers would typically stay at home, smoke marijuana, and play video games such as "Ethnic Cleansing." Both indicated that Defendant also sold marijuana. Witness 2 noted that the house had smelled of marijuana when she visited on October 27 and on November 4.

During its investigation prior to Defendant's arrest, the FBI confirmed that Defendant and Bowers "followed" each other on Gab. Defendant's profile picture on that site is photograph of two people in ski masks, believed to be Defendant and his brother, posing with guns. Defendant described himself on his profile page as "Aka DC Stormer," and as "meth-smoking, pipebomb-making mailman-murdering, . . . bathing in White priviledge," stating "Bowlcut Nationalism is the only way forward."[1] On October 26, 2018, Defendant posted a caricature of a rifle-toting man spattered with blood, which was followed by the post, "Nah, he was BASED! Get used to it libtards. This was just a dry run of things to come." That post appears to follow an image of the van that was seized from Cesar Sayoc after his arrest on October 26, 2018, for charges related to his alleged mailing of pipe bombs to various public figures, including former President Barack Obama. In later posts, Defendant praises Bowers as a "hero" with the epithet "'Real White Power Hours' Bowers."

Defendant was arrested on November 9, 2018, pursuant to an arrest warrant issued by this Court. In an interview with FBI agents, Defendant stated that he and his brother had become interested in firearms because they believed that there was going to be a civil war. He further stated, among other things, that although he never "issued any credible threat," he did say "some

---

[1] The FBI indicates that references to "bowlcuts" and "bowl gang[s]" are intended to invoke Dylann Roof, the white supremacist who mass-murdered nine people at the Emanuel African Methodist Episcopal Church in Charleston, South Carolina, on June 17, 2015. Defendant's Gab username is "DC BOWL GANG@PureWhiteEvil." And, indeed, Defendant's Gab profile includes images of Dylann Roof, with his distinctive bowl haircut.

very, very extreme stuff," admitting that he "maybe like expressed like support of violence if certain lines were crossed." Asked to explain what he meant by "lines" being "crossed," he stated, "We should take up arms against the government if they take away our guns." Defendant further admitted to being a long-term user of marijuana.

On that same day, law enforcement executed a search warrant at the residence at which Defendant lives. Officers noted that the residence smelled of marijuana. In Defendant's bedroom and an adjacent room, agents seized ten marijuana plants, each of between six and eight inches in height; marijuana smoking paraphernalia, including pipes, bongs, and THC vapor pods; and a marijuana grinder. Another, larger marijuana plant of approximately three feet in height was located on a patio.

Agents also seized a firearm, shotgun shells, and other ammunition from the bedroom. In Edward's bedroom, agents seized another firearm, two ballistic vests, two ballistic helmets, additional ballistic-resistant plates for ballistic vests, and two gas masks.[2] According to the FBI, the ballistic vests appear to be the same as those worn in some of Defendant's posts on Gab.

In a sectioned-off area of the basement, agents recovered additional body armor and helmets, boxes of ammunition, including hollow-point ammunition, and various anti-Semitic images. The missing lower portions of the AR-15s were not found at the residence.

When he was drug-tested November 10, 2018, following his arrest, Defendant tested positive for marijuana.

B.  **Defendant's Criminal History**

Defendant has no criminal convictions, although he was arrested in 2008 by the U.S. Park

---

[2] The firearms seized at the residence are "black powder pistols," which are functional replicas of historical guns that utilize gunpowder and a projectile rather than a modern ammunition cartridge.

Police for possession of marijuana and distribution of marijuana. He was not charged for either crime.

## II.     LEGAL STANDARD

The Bail Reform Act of 1984, 18 U.S.C. § 3142 *et seq.*, provides, in pertinent part, that if a judicial officer finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the [defendant] before trial." 18 U.S.C. § 3142(e). Thus, even if a defendant is not considered a flight risk, his or her danger to the community alone is sufficient reason to order pretrial detention, and vice versa. *United States v. Salerno*, 481 U.S. 739, 755 (1987); *United States v. Perry*, 788 F.2d 100, 113 (3d Cir. 1986); *United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986). Where the judicial officer's justification for detention is premised upon the safety of the community, the decision must be supported by "clear and convincing evidence." 18 U.S.C. § 3142(f)(2). Where the justification for detention is risk of flight, the decision must be supported by a preponderance of the evidence. *See United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).

## III.     ANALYSIS

Pursuant to 18 U.S.C. § 3142(g), the four factors that must be considered in making a bond determination are: (1) the nature and circumstances of the offense; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). Addressing those factors, the Court has determined that Defendant should be held pending trial because he is a danger to the community.

### A.     Nature and Circumstances of the Charged Offense

This factor focusses on "the nature and circumstances of the charged offense," including, among other things, "whether the offense . . . involves a . . . controlled substance [or] firearm." 18 U.S.C. § 3142(g)(1).  Defendant has been charged with a violation of 18 U.S.C. § 922(g)(3) for being an illegal user of a controlled substance in possession of a gun.  Congress has seen fit "to bar the possession of firearms by certain types of persons it considers dangerous," *United States v. Winchester*, 916 F.2d 601, 606 (11th Cir. 1990), among them illegal users of controlled substances, such as marijuana, *see United States v. Carter*, 750 F.3d 462, 467 (4th Cir. 2014) (finding that the government had "amply demonstrate[d] a connection between marijuana use specifically and violence").  Indeed, the maximum penalty of ten years that Defendant faces if convicted clearly reflects Congress' opinion that the offense is a serious one.  *See, e.g., Schrader v. Holder*, 704 F.3d 980, 987 (D.C. Cir. 2013) (noting that a maximum sentence of ten years reflected legislature's view of the seriousness of the crime).  Moreover, courts have recognized that the purpose of large capacity ammunition feeders, which Defendant is charged under D.C. law with possessing, is increased lethality "most suitable for military and law enforcement applications."  *Kolbe v. Hogan*, 849 F.3d 114, 137 (4th Cir. 2017) (en banc) (internal quotation marks omitted).  The maximum penalty for that offense is an additional year of incarceration, which is not insignificant.  In short, both of the crimes with which Defendant is charged are serious offenses.

For these reasons, the nature and circumstances of the charged offense favor detention.

### 2.     The Weight of the Evidence

The weight of the evidence against Defendant is strong and therefore favors detention.

There is ample evidence that Defendant is a habitual marijuana user. At the detention hearing, the government represented that Defendant had made statements to the FBI about his long-term marijuana use. Witness 1 and Witness 2 also asserted to law enforcement that Defendant uses marijuana daily. Witness 1, Witness 2, and law enforcement personnel who searched Defendant's residence noted a pervasive smell of marijuana in the premises. The search revealed a marijuana-growing operation and drug paraphernalia in or near Defendant's bedroom. And Defendant tested positive for marijuana after his arrest. As to the guns, the FBI recovered three firearms that were registered to Defendant or his brother and an additional gun that Defendant provided to a family member. Two more firearms were found during the search of his residence. Moreover, Defendant's Gab account displayed pictures of him holding firearms.

    3.  *The History and Characteristics of Defendant*

The history and characteristics of Defendant also favor detention. Section 3142(g)(3) directs the Court to consider: (1) the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (2) whether, at the time of the current offense or arrest, the defendant was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state, or local law. 18 U.S.C. § 3142(g)(3)(A)–(B).

Defendant has ties to the community, having lived in the District of Columbia for fifteen years, and he has no record of failing to return to court, factors that militate against a finding that he is a flight risk. However, whatever his ties to the community, they have not deterred him from

engaging in criminal behavior that appears to have been of long-standing duration. *See United States v. Bess*, 678 F. Supp. 929, 935 (D.D.C. 1988) ("The history and characteristics of Defendant—his family and community ties, his educational and employment record, and his lack of prior convictions as an adult—did not deter him from committing armed robbery in the first instance . . . ."). Indeed, it appears that the circumstances of his home life allowed, if not fostered, his drug habit and his passion for firearms; law enforcement found open and obvious cultivation of marijuana, as well as numerous guns, both registered and unregistered, in the house. Moreover, the fact of his unemployment, the discovery of the marijuana plants at his residence, and statements Witness 1 and Witness 2 made to law enforcement suggest that Defendant may be supporting himself by selling the drug. These facts support pre-trial detention.

    4.    *The Danger to the Community*

As for an assessment of dangerousness, the Court finds that at this time Defendant would pose a danger to the community were he to be released. Defendant's drug use (perhaps drug addiction) in combination with possession of and access to weapons, including multiple firearms—some unregistered—high capacity magazines, and AR-15 lower assemblies which were never fully recovered, is decidedly concerning. Law enforcement searching his home also found body armor, bullet proof vests, and helmets, as if he were preparing for a battle. Indeed, Defendant indicated to the FBI that he and his brother acquired their firearms in the belief that a civil war was coming.

Moreover, Defendant has made a number of menacing statements that cannot be ignored in evaluating Defendant's dangerousness. According to witnesses, Defendant has fantasized about killing "Jews and blacks"; indeed, he openly discussed doing so with the witnesses. Defendant apparently referred to Cesar Sayoc's scheme of sending pipe bombs to various prominent public

figures as "a dry run for things to come." He further indicated to law enforcement that he had advocated for violence in the event that the government came for his guns, an eventuality that has now occurred. The government's papers are rife with other alarming assertions that Defendant has made. Added to this is the fact Defendant's anger and agitation appear to have intensified recently following the shooting at the Tree of Life Synagogue and his brother's suicide. His family members found his behavior so worrying that they reported him to law enforcement and made efforts to remove his firearms.

These facts in combination leave the Court with no confidence that releasing him back into the community—even (or especially) under house arrest, which would return him to the residence where he has been abusing drugs daily and amassing weapons—would reasonably assure the safety of the community. The undersigned therefore finds that there is no condition or combination of conditions that would keep the community safe if Defendant were released.

## CONCLUSION

Based on the consideration of all the evidence, the factors set forth in section 3142(g) and all lesser restrictive alternatives to pretrial detention, the Court finds by clear and convincing evidence that no condition or combination of conditions exist that would reasonably assure the safety of any other person or of the community if Defendant was released. Therefore, the government's motion for pretrial detention is **GRANTED**.

## DIRECTIONS REGARDING DETENTION

Defendant is **ORDERED** remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending

appeal.  Defendant must be afforded reasonable opportunity for private consultation with defense counsel.  On order of a court of the United States or on request of an attorney for the government, the person in charge of the corrections facility must deliver Defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

Date:  November  21, 2018                    _____
                                             G. MICHAEL HARVEY
                                             UNITED STATES MAGISTRATE JUDGE